Good morning, ladies and gentlemen. Our first case for this morning is Alarm Detection Systems against Orland Fire Protection District and also Alarm Detection Systems against Village of Schaumburg. Mr. Goldsmith. Thank you, Your Honor, and may it please the court. The errors that permeate both of these cases relate to the failure of the district courts to actually interpret the operative ordinances. The ordinances say that you must send a signal directly to a designated remote supervising station in compliance with NFPA 72. This court went to great lengths in the two ADT cases to interpret what NFPA 72 meant in that context. The district courts failed to recognize that and therefore were led astray in interpreting the ordinances to require that the signal be sent on one piece of equipment owned by Tyco to either Orland Central Dispatch or to Northwest Central Dispatch. From the standpoint of looking at the case from the Sherman Act, it's quite clear that there is no state action immunity because the operative law is not a law that clearly articulates a policy that would create antitrust immunity. Of course, the Illinois legislature didn't see it that way. The Illinois legislature specifically said if you're acting within the scope of Chapter 11, you get antitrust immunity to the greatest extent possible. Then you have Town of Hallie saying that if you're a municipality, you don't need to satisfy the second part of the MidCal test, the active supervision test. Well, first of all, the ordinances by themselves do not establish the challenged conduct. The ordinances have a neutral flavor to them. You just must send the signal to a specific location. Well, a direct connect. No, direct connect is not a term of art. It's not a term in the ordinances. It says you must send the signal to the remote supervising station in accordance with NFPA 72. In fact, all the alarm companies can send the signals to Northwest Central Dispatch or Orland Central Dispatch without using Tyco equipment. They can use the same AES transmitters. They can actually use the same frequency that Tyco uses and send the signal. So it's identical. But then they couldn't monitor the equipment, correct? No. Monitoring is the receipt of the signals and processing it. In other words, dispatching if it's necessary. So there's three types of signals, alarm, supervising, and trouble. If you get an alarm signal, you have to dispatch. That signal goes ultimately to the dispatcher. As we pointed out in our demonstratives and in our argument, the equipment that alarm detection and the other alarm companies can use can send the signal automatically by retransmission directly to the CAD, which is where the actual dispatching occurs. But the municipalities, just to be clear, they argue quite consistently that they don't want the retransmission. They have thought about it and they think that the direct transmission to the monitoring point from the commercial location is preferable. Now that may be unwise or it may not even be technologically accurate, but that seems to be their view. Their view is not supported by the language of the ordinances. What would be exactly the language in the ordinance that you're relying on? It's basically identical. Orlin, all new and also existing fire alarm systems shall be monitored by a remote supervising station as designated by the village in accordance with NFPA 72. Right. And so when they say a remote supervising station, what I understand that to mean is not a central station. Central station would be the alternative technology, a widely used technology. I don't doubt that for a second. It's true. But a remote supervising station is a different kind of approach to this problem. Actually, it's not because central stations also qualify as remote supervising stations, but that's not the point. The point is, in the first opinion from this court, it recognized that automatic retransmission is permitted by NFPA 72 and does not require the intervention of a central station operator. I understand that, and I well remember the earlier cases, but there are some very significant differences between the earlier cases and this case, both as a matter of fact and as a matter of law. The legal issues before the court in what we are all calling ADT 1 and ADT 2 are different. No, they're not different. Oh, yes, they are. Excuse me. But they are different. There were issues about authority under state law that were very important at that point. The antitrust claims had not been teed up, so they were not present in the case. There are a number of significant differences. Nobody disputes that the standard under the fire code might be met by either a central station or an RSS, but these entities chose to go with RSS. Nothing in the standard says they can't do that. From the first opinion in ADT 1, it's clear that an authority having jurisdiction could designate a remote supervising station and choose not to receive transmission from a central station operator. That doesn't make it preclusive. And in fact, the villages only provided that the signal had to get directly to, and directly is not even the right word, the signal had to get to the remote supervising station. All the alarm... As I said, in ADT 1, and of course this gets changed in ADT 2 because the record was more elaborate, the opinion says, we hold that the district has the statutory authority to require the commercial multifamily buildings connect directly to the district's monitoring board and to do so through wireless radio technology. So that's the holding. It's understood that that is different from a central station. It's not different from the means of transmission in the context of this case. It's different from a central station. giving the information to a dispatcher. The issue is, is it going wirelessly? Is it going to the Overland Central Dispatch or Northwest Central Dispatch directly? And it is because in every one of these means, it goes through a series of steps that gets it there electronically. And the ordinances just contemplate the electronic. They may say that they have a preference, but it's not in the ordinance. We have to start with the plain meaning of the ordinances. The villages didn't do anything in really any of the three cases by themselves to affect this end result. On the contrary, they have a plain vanilla requirement, which can be easily met in a number of different technologies, all of which are NFPA compliant. So your position is that even though all defendants, Tyco, the others, and the fire protection district in the village, that they have all collectively, and the two district judges, misinterpreted what's required here just as a factual matter? Everyone collectively has, other than the plaintiffs. As a factual matter, as a matter of law, because the language of the ordinances, which I just quoted, only require that the signal be sent to the designated remote supervising station. We can do that without the intervention of a human contact with the signal, and we can do it in this day and age in the same way as everybody else does it with respect to wireless technology. But we can do it in a number of different technologies that are approved by NFPA 72, all of which are barred by the way in which they're interpreting the ordinance, not the way the ordinance is written. The ordinance is very simple in terms of its requirements, and for that reason, Judge Wood, in response to your question, the municipal code isn't the source of authority because the ordinance itself is neutral. It's the implementation of the ordinance by a fire protection district, which this court has already ruled does not have the authority to take over. Well, that's a different thing. The fire protection district in the cases presently in front of us is not doing the monitoring. It's not charging people anything. The fire protection district has entered into an exclusive contract with Tyco, and Tyco is performing these functions. It's Tyco's equipment that's in the monitoring station. Payments are made, which I know you challenge, but payments are made from Tyco to the operator of that station. And so it's really not the fire protection district. What we were talking about before was that the fire protection districts did not have under state law the authority to be in the business and to oust others from it. But they are because the ordinances don't contemplate an exclusive provider, and I beg to differ with you. The monitoring is done at Orland Central Dispatch. It's being done by Orland Fire Protection District employees because the code requires the state... The equipment that the signals come in on is owned by Tyco, right? Yes. Okay. But that's not how monitoring... Well, okay. So, and they have to get a particular frequency, right? And we have indications from at least Judge Durkin that dual transmission is not technologically feasible at this point. This court addressed dual transmission in, I think, the first ADT. No, but... It's not a question... But that wasn't based on facts. Maybe you could allege it, but that wasn't based on the facts. Judge Durkin made the factual determination and even gave you the opportunity to submit supplemental briefs to support your position of technologically can you have dual transmission. And you didn't meet the burden of establishing that technologically that is something that could be done. That's very different than saying, well, you pled it and you pled it could be done. You went to trial before Judge Durkin and couldn't prove that essential fact. No, on the contrary. I think he invited it in the post-trial briefing, too, at least as I read his footnote one in his opinion. Right. Dual transmission has nothing to do with this case. The question in this case is, can we send a signal in the same way, wirelessly, directly to the... And I shouldn't use directly, but... To the remote supervising station. Right, because you can't use directly and Judge Durkin finds in his opinion that that is a critical difference between the way you were proposing to send these signals to the RSS and the way Tyco was sending the signals. Tyco was engaged in what people are all calling a direct connection and you weren't. It's your computers. I'll give you that it's your computers, not a human being, because you've made very clear that this can be done by machine. But there's an intermediate step. There would be no point to having a central station if there weren't that intermediate step, and many of your arguments rely on that. You have charts showing that by using a central station, you can do more than just monitor for fire. You can monitor for equipment failures or supervisory failures. You can send a repairman out. You can do all kinds of other things. So there is this intermediate step. There doesn't... No, there does not have to be an intermediate step. But there is. No, there doesn't. Because if we use the same AES transmitters and we use the same frequency, it goes directly to the remote supervising station. It does not go through the central station computer. Can you get the same frequency from the FCC? Or is that... It appeared from the evidence and from Judge Durkin's holding that only one company can get that frequency. If another company comes in to get a frequency license, you get a different frequency. The testimony was that all the alarm companies could use the same frequency to get the signal there without going through a central station. You testified that the different alarm companies could get the same frequency from the FCC. I didn't see that anywhere. Without at least contracting one of these third-party contracts with Tyco, which, of course, you could have done. The ability to do it was testified by Ed Boniface and, I believe, several other witnesses. Was there anybody from the FCC who came in and said... No, there wasn't a question of whether we could use their frequency. The question was, could we do it the same way they're doing it? And the answer was, by numerous witnesses, yes. It's done in other jurisdictions. But the downside is then trouble and supervisor signals are not being handled. They go to the dispatcher, and the dispatcher has to somehow deal with them. So if you use that one frequency, as you say you can, can you monitor? You can't monitor that, can you? No, but I wanted to clarify what monitoring is. So there seems to be some confusion in that. But you agree you can't... Let me finish, please. Sure, I'm sorry. If you use that single frequency, you agree that you cannot provide monitoring services. Yes, because we don't get the signal so that we can't tell whether the system is in alarm, trouble, or supervisor. Then how does that square with your market definition in the antitrust claims, which includes monitoring services? Because we don't want to be precluded from automatically retransmitting the signal. They've created a monopoly in both jurisdictions without authorization by the ordinances, but by their scheme. In Orland, it's the contract between Tyco and Orland's Fire Protection District. In Schaumburg, it's the contract between Northwest Central Dispatch and Tyco. And then the notice from the village, which says you have to contract with Tyco, you have to pay $81, you have to terminate your contracts with the existing providers and go to Tyco and Northwest Central Dispatch. So you agree that your argument that you could use one frequency would not square with your market definition, that you'd have to go back to the district? It would be an unsatisfactory result. It doesn't really square with it. Yes, but it's not what's required. What's required is we get the signal without intervention to the facility, and we can do that. So whose equipment is your signal going to come in on? Is this Tyco's equipment, or are you going to put equipment in the... Why do you get to use Tyco's equipment? Well, the question is would we need other equipment? The testimony was no. Well, but why do you get to use Tyco's equipment? Because it's not exclusive. So that's the nature of the contract. Actually, this relates to a lot of parts of this case. It's not at all uncommon for municipalities to enter into exclusive dealing arrangements for certain purposes. They might have a single company that has the contract to pick up the trash in their area. They might have a single company that has the contract to provide cable TV service, or they may have a single contract, in this case, to provide for monitoring of fire alarms from commercial buildings. Exclusive dealing arrangements are garden variety in antitrust, and there's normally competition for the contract. The contracts expire, as they do here, every three years, every ten years, with one-year renewal, whatever the term is. And then you would have the opportunity to bid to be Tyco next time around. It's not the exclusive provider that's the issue here, because the equipment, the receiving equipment, can receive signals from any source. I know, but somebody has to buy it, install it, maintain it, make sure that it's working properly. So I don't quite understand why you get to free ride on their installation of this equipment. Well, that's their business model, to take it away from everybody else. But you're not answering my question, though. Wouldn't you have to pay them some money? That's why they have these third-party contracts, actually. Well, they don't have to be receiving the signal. They've chosen to receive the signal. They get tax dollars for that purpose, and there's no reason for them to get a separate source of revenue, which is... Wouldn't you agree with me, somebody has to procure and pay for the equipment at the final point that receives the signals? I mean, you don't just walk into an empty room and have signals received. Every dispatch center has dispatch equipment, which Tyco provides as part of their contract. Right, Tyco provides as part of their contract. The receiving equipment for monitoring is separate from that and wouldn't have to be there. If they choose to have the signal go there to be monitored by employees of the dispatch center, then they've chosen to take it one step further. And the question is, can they do that to exclusion of everybody else? It's not an exclusive contract in that sense. Also, in Illinois, normally where there's an exclusive arrangement, like for garbage collection or water treatment or sewage disposal, there's a state statute which contemplates and clearly articulates that it's intended to be anti-competitive and can be exclusive. There's no contract that deals with monitoring. Well, I'm going to just say, yes, I'm familiar with the statutes that you're talking about, but it's also the case that exclusive dealing arrangements are not another way of saying monopoly. Their contracts turn over every so often, and they require investment on the part of the company that's providing the services. So that's why you get this period of exclusivity. Well, if we're correct that the underlying requirement is illegal, we don't choose to compete in contracts where fire protection districts are collecting fees. And the essence of the requirement you're challenging, is their choice of RSS? No. RSS is fine. If they want signals to go there, we'll send signals there. We can send them automatically, and we can do it either without getting the opportunity to also monitor, or we can do it with the ability to monitor by automatic retransmission. Either way, we can comply with the ordinance. And that's the real rub here, because, you know, I suppose—  What is alleged to be unlawful, if it's not the ordinance and the direct connect? Well, the ordinance doesn't require the use of Tyco transmitters. But what exactly is illegal? Well, the contracts between Orlin Fire Protection District and Tyco creates a contract in restraint of trade. So the exclusive contracts that were entered into are what violate the law? Well, what's exclusive in those contracts is the transmission equipment and the servicing of those transmitters. All right. This court held in ADT 1 that the transmission end of the system is the subject of the choice of the owner of the property. And so when you cross the line and you take away that choice, you're creating monopolistic activity. We did not say anything about that in ADT 1. We did not have an antitrust claim in front of us. No. We didn't make an antitrust holding. You said under NFPA 72, it was the requirement of the code that the owner of the property have the right to choose the transmission equipment and the service provider. That choice has been eliminated, even though all three of these ordinances say they're subject to NFPA 72 and make no exclusionary requirements. The missing link here is how did we get from the point where you had to send your signal to a remote supervising station and that you had to get Tyco to provide the transmitters, send and provide the service, and pay a super competitive fee for that privilege? And that's where the disconnect is. None of the ordinances say that you have to use a single provider. None of the ordinances say that you have to buy one type of equipment. In fact, it takes away all innovation in the industry, which has moved on to cellular and IP, and there's all kinds of technology out there. And we're saying that AES transmitters are the only way. But you didn't present evidence of that technology to Judge Durkan. Absolutely. We had extensive evidence about the alternative means. Patrick Devereaux, one of a number of witnesses, Ed Boniface, another of the witnesses, testified that IP cellular is all out there. In fact, they are doing automatic retransmission in a number of communities now. So that technology is here. But again, it would go back to the retransmission, not the direct connect. Well, there's nothing that's direct. Every one of these systems has to transfer through many links before they get to the end place. So in the AES system, there's a bunch of radios, and radios communicate with each other in the system. Then it goes to an IP link. Then it goes to additional equipment. Then it goes to the receiver at the dispatch center. And then the dispatcher has to type it into the CAD for dispatch. In the system we're talking about, it eliminates the need to get it to the receiver. It goes directly to the CAD. You do not need new equipment. And in the context of that, the owner of the premises has a right to choose a provider, has a right to choose the type of equipment, and has a right to pay a competitive price instead of a super competitive price for that purpose. All right, if you would like to save some rebuttal time, I would advise you this is probably a good time to do that. I would like to do that. Good morning. Are you Mr. Young? I am, Your Honor. Good morning. May it please the court, counsel, I represent Tyco Integrated Security in both appeals, and I'm here to argue for 15 minutes on to argue that the decisions of Judge Pallmeyer and Judge Durkin should be affirmed on the substantive antitrust grounds. My colleagues who represent the other appellees will take the remaining time to address the constitutional, state action, and state law claims. Tyco will rest on its briefs on the constitutional and state law issues. This case involves a decision by local governments acting through elected officials and fire safety professionals to enact local ordinances requiring a particular system of fire alarm monitoring, that system's direct connect monitoring, and to implement the system through exclusive dealing contracts with private alarm companies. So what about Mr. Goldsmith's technical point that he just closed with, that there really is no such thing in today's world as direct connect? If I even made a phone call to you from sitting right here from my cell phone, it would connect to a tower, it would bounce around, you know, it would stop a few places. Yes. That argument's a red herring, Your Honor, and the reason is is because the evidence at trial in the Orlin case and also in the complaint that was filed in Schaumburg was clear as to what the village's intent was, and Judge Durkin cited to it the intent was to have a direct connect requirement similar, like the Lyle Woodridge case, in which signals would go from the commercial businesses, what we call the commercial accounts, directly to the remote supervising station. Technologically, yes, radios communicate with themselves. They bounce from one place to the other, but the important part was the village's intent that those signals come directly, uninterrupted, to the remote supervising station, which in Orlin was the Orlin Dispatch Center. In Schaumburg, it's Northwest Central Dispatch Center. So how important is it to your theory that there is or is not a human agent in that intermediate stop? That's also a red herring, Your Honor, when you get back to what the village's intent is, and Judge Durkin hit on that point correctly. Automatic retransmission, he can argue faster, maybe more reliable. That's beside the point. The point is what these elected officials who are politically accountable decided to do. They decided they wanted a direct connection. They did not want signals to go some other place to a central station and then bounce over to the remote supervising station. Is there any reason to say that that's totally irrational in light of modern technology? This is not 20 years ago. This is now. I mean, what if it's an amount of time that's actually immeasurable from a human standpoint? So what if it stops off at a central station as it bounces over to the RSS? Your Honor, a number of the fire safety professionals who made that decision testified in the Orlin case, and one can argue over whether it's rational or not, but the bottom line is that was their decision. They're elected officials politically accountable to their constituents. They made that decision, and once they made that decision, Your Honors, the question for this court and the claims that ADS presents is do those decisions violate the antitrust laws? Do they violate the Constitution, which my other colleagues will address? And the answer is that Judge Durkin and Judge Pallmeyer correctly found that they do not, analyzing the ordinances the way they should, which, by the way, Mr. Goldsmith didn't mention it, but it was of record before Judge Durkin that the arguments that ADS made to you today about what they can do, that the ordinance is neutral, and that a central station is a remote supervising station, and please designate us as a remote supervising station that can receive those signals, were all made before this trial, and the village's response was no. We prefer the way it's being done right now. So you can argue over the interpretation of the U.S. bottom line. In the Orlin case, let me tell you one of my impressions that kind of follows from what you're saying. If the direct connect choice is a lawful choice, in several places in Judge Durkin's opinion, I read him to saying it necessarily follows that there has to be exclusivity because of the technological and perhaps economic limitations. That exclusivity went to Tyco here. Is that correct? I mean, in other words, is that a correct reading? I mean, he seems to hang a lot on exclusivity just follows like night follows day. The moment direct connect is required. Yes, that's what his analysis was, and it was a proper analysis based on the record. The trial record contained a lot of evidence about the practice of direct connect and exclusive contracting in this industry in the greater Chicago area over the last 30 years. I mean, you've seen it in the Hinsdale decision. You've seen it in this court in ADT 1 and ADT 2. That's a practice that's established, and so that gives some color to why he cited, hit on the fact that dual monitoring, there was no technological, there was not technologically available and not economically available, that that was important to him because once the ordinance is passed and the authorities having jurisdiction in the villages decide they want that direct connection to the remote supervising station, it comes to, it almost by definition has to be exclusive, or at least that's the way these elected officials have decided that's the best way to implement, to obey that law, if you will, looking at it under the Fisher analysis. Now, talk to me a little bit about the price difference because if I'm remembering, in your briefs you admit that the direct connect is something in the $80 per unit and the central station is much cheaper, you know, the 50 some odd dollars. So, you know, what explains that and why isn't that some evidence that there is anti-competitive activity afoot? Well, two things. It's comparing apples to oranges. As Judge Durkin found, they are two products. They seem like close substitutes. I mean, you know, a pencil and a pen are different products too, but I can use either one to take notes. And we use the analogy of an Audi and a Ford. Which are also probably in the same economic market for cars. Right. And let me explain the difference because it was important distinction made at trial and Judge Durkin got it. Central station, Tyco, for example, has, I think, the number that was used in the briefs was 4 million customers. I'm not sure if that's true or not. Say 4 million customers, 5 central stations. Each additional customer, the equipment is there and you don't have additional costs for each add-on customer. Central station, I'm sorry, Direct Connect or remote supervising station requires Tyco at the outset of that contractual relationship to take the equipment that costs not as much as central station, but it's expensive, and put that single piece of equipment in a dispatch center. That has a cost. Once that's been done, though, I mean, you get the equipment in the dispatch center. I assume you have to have something compatible in the commercial property, the multi-unit building or the commercial building. Is that equipment also owned by Tyco? Yes. Okay. And the point I was making, Your Honor, was just that you have a much more limited amount of customers using that expensive equipment at the dispatch center. In Orland, for example, there were 655 commercial customers as opposed to maybe a million that would go into a central station. So it's more expensive. Cost-wise, it's more expensive. But you don't have to put in new equipment for each new customer under the Direct Connect, do you? You have to put it in the commercial facility, but not in the receiving facility, do you? Correct. That equipment, the head-end equipment is there. But you're just spreading it over a vastly smaller number of people. That's exactly the point, Your Honor. Yes. So that's why the price is different. It's a different model, albeit very close. But you also have to understand, too, when council says it's $89 that Tyco charges, that's super competitive, $23.50 is a village fee that goes to Orland. That's another issue for Orland to address. So now you're down a charge of $65.50, and the point the antitrust, the economist expert, made at trial to Judge Durkin was that when you looked at Tyco's prices, on average, in non-mandated jurisdictions, which were jurisdictions in which the customer, the commercial businesses had the choice to go either central station or remote supervisory, Tyco's charge was $68. So it was not super competitive at all. Which moves to the point, there was a lot of argument. You asked Mr. Goldsmith, what is the challenge? What are you challenging? What is the restraint? And it's gone back and forth as we've gone through four years of litigation. Judge Durkin appropriately analyzed the ordinance under Fisher and found that it was unilateral because it was complete upon enactment and, therefore, was no concerted activity under the Sherman Act. Well, that's the Section 1 point. That doesn't help you any with Section 2. Correct, Your Honor, although there are some overlaps because in Section 2, Judge Durkin also found that unilateral government action, in this case granting an exclusive contract, does not rise to the level of the acquisition or maintenance of monopoly power. So the unilateral concept is still there. In other words, he found— Professor Bork would argue that the most durable monopoly power of all is that which is supported by government regulation. I think Judge Posner might have said something along those lines as well. And Judge Posner recently, two years ago, in the Methodist Hospital case, echoed your point, Judge Wood, that exclusive dealing contracts, he said what's more common than exclusive dealing contracts? They're illegal, they're common, and to the extent ADS tries to argue that you should look at or Judge Durkin should have looked at the exclusive contract as a hybrid restraint, that just misconstrues Fisher and Judge Durkin's analysis. If you're going to solely look at the exclusive contract, now you're into Methodist Hospital and now you're into a rule of reason analysis. And it easily passes muster under the rule of reason for four important reasons. One, we just discussed, TACO's prices aren't super competitive. Two, the contracts, a point Judge Wood made, were not perpetual. They were of limited duration. There was competition for the contract when they were up for renewal. There was testimony trial about the private alarm companies that are financially viable and have the technologies to be able to compete for the contract when they come up for renewal. Do I remember that the record shows or does it show other places in the greater Chicago area that have people who won the contract other than TACO? Yes. So there were other companies who participated in these kinds of bid processes and they prevailed. Yes, yes, and there was testimony in the record of TACO having lost contracts. After they were in place for a while? There's an entrenchment argument here, inertia, whatever you want to say. That's true. I think there were two examples. Winnetka, I think, went with someone else and TACO lost that contract. We know TACO lost the contract in Lyle Woodridge and the city of Bensonville, I believe, was testimony that TACO had lost that contract. Were they direct connect contracts? Yes, they were. They were. And then, so the most important point, I think, is also that there's no foreclosure here. 655 commercial businesses in Orland represent less than 1% of the commercial businesses in the greater Chicago area. But the district judge never nails down what the geographic market is. If there had been a finding of fact that the geographic market is the greater Chicago area, then you would have an ironclad argument on that point. But the district judge kind of pushes it off. He didn't make that finding, Your Honor. But in the record, there was undisputed evidence as to what that market was. There was a dispute between us as to what the market was. ADS claimed that the market is the scope of the exclusive contract, which doesn't make sense because if that was truly the law, then every exclusive contract would create a monopoly that violates Section 2. And that is not the law, as Judge Posner recognized two years ago in Methodist Hospital. But, you know, the point that I think this underscores, at least with foreclosure, there was no testimony, by the way, that any private alarm company only competed in Orland. And there was no testimony that any private alarm company was weakened by this exclusive contract because of the low foreclosure they couldn't. ADS says they've been foreclosed, though, from this Orland market and the Schomburg market. Any competitor who competes for exclusive contracts would. They have an opportunity when the contract expires to compete again. Can you explain to me how these third-party contracts worked? Sure. If ADS, and there was testimony of this at the trial, if ADS has a customer that it wants to keep in Orland, it can. So it just enters into an agreement with Tyco at that point. And there's liability reasons as to why Tyco, who's receiving these signals, wants to have a touch with that commercial business, which you can understand. But it allows them to maintain that customer contact. Tyco does the monitoring, but it's a pass-through, or ADS could upcharge on it. But it allows them to also do the inspections, the maintenance on the systems that the commercial businesses own. And, by the way, at trial there was testimony about that, that of the 655 accounts that Tyco has that are coming directly into Orland, only about 180 that Tyco does all of the work for them. So if you subtract 655 from 180, whatever's left are going to other businesses for the maintenance, the inspection, the testing of their systems. All right. I see my time is up. Thank you very much. Thank you, Your Honors. Mr. Roche, are you next? Yes, ma'am. Good morning. May it please the Court, my name is James Roche. I represent the Appali Orland Fire Protection District. The Orland Fire Protection District especially requests that this Court affirm the decisions of the trial court, both after a lengthy trial and a motion for summary judgment. My co-counsel is addressing antitrust claims brought by ADS and immunity. This morning I'll be addressing the district court claim. The first point regarding the issue of standing, Judge Durkin properly granted our motion for summary judgment due to the fact that there's no private right of action under the District Act. That's not really a standing point, that's a merits point, but yes, you're right, Judge Durkin issued that ruling. Yes. Judge Durkin, when he made his ruling, he found that the ADS case and the original Lyle Woodridge case never addressed the issue of standing. Only in our motion for summary judgment was it brought up as an issue of first impression, and then he read the briefs, he made his decision, he found there's no right of private action under the District Act for a third-party alarm company. Well, for a competitor like that, I mean, he didn't rule out the possibility of a private right of action for a customer perhaps or somebody else. Yes. So the cases as presented by the appellants just referred to other cases in which that there were firemen who sued under the District Act have nothing to do with the case we have here with the third-party alarm company. Also, the appellants in this case have constantly referenced Lyle Woodridge case. As the court has already referenced in oral arguments, our system was totally different than the Lyle Woodridge case. Lyle Woodridge was in the alarm business. We are not. We're in the fire suppression business and the ambulance business. Why is an economic matter is that different? Lyle Woodridge was, as you say, in the business itself, and there was an issue under state law about that. It's just sort of a magic fix for you to just enter into an exclusive contract with somebody else and then announce we're not in the business? Well, no, of course it's not quite that simple, Your Honors. First of all, we have a mandate from both the Village of Orland Park and the Village of Orland Hills. That's extremely significant. At trial, both the village managers from Orland Hills and Orland Park testified that they were approached by the appellants in this case and examined all the best ways that their constituents could be served by the Fire Protection District. They're all independent, different boards of trustees, different legal representatives. After they heard all the information, they made the determination into an ordinance that mandates a direct connect. So the key is that it's a village ordinance, not something from the Fire Protection District? Exactly, Your Honor. It's not something that the Fire District just made up on their own and went into this contract. It's a mandate from the village itself. And under the case of the Hinsdale case, the Illinois Appellate Court case, they have the statutory right to enter into these agreements. Courts have already touched on the basis of exclusive contracts with municipalities and governmental agency and the natural conclusions that come from those contracts. Judge Durkin said not only is it obvious and apparent, but it's a natural flow that you enter in exclusive contracts for the protection of your citizens. The natural flow is going to be maybe a single provider as we have here. Mr. Roach, what's your response to Mr. Goldsmith's argument that everyone has misread the ordinance? That's not correct, Your Honor. Why? The ordinance says right on there the term direct connect and the remote supervisor station. Everybody in the case, this has never been an issue until the briefs were done. At trial, the supervising station and direct connect are interchangeable terms. So when the ordinance say, and also the village managers of Orland Park and Orland Hills also testified that they wanted direct connect, that they made the determination, they reviewed, they talked to the fire protection people, they talked to the ADS people, and in their opinion, this is the best vehicle to enter into the mandate by the Illinois legislature under the District Act, which says the most important thing is that the fire protection district is there for the public safety and welfare of its constituents. Was that testimony challenged at all at the trial as to the village's intent? No, it was not. Mr. Roach, what is the 2354, the fee that you collect? Well, it's a contract, Your Honor, so we have here an arm's-length transaction. But what does it cover? I know it's part of the contract, but what's it for? Well, it's just a consideration for the basis of the contract. What our CFO testified, Carrie Sullivan, at the trial is that our dispatch center has staff 365 days a year, three people on a shift, eight-hour shifts, so we have a total of nine people working every single day, Christmas, 4th of July, and therefore, actually, for us, it's losing money, but we don't care because our mandate is public safety. All right. Thank you very much, yes. Thank you, Your Honor. Mr. Jablecki? Jack Blecki? How do you pronounce it? Jablecki, Your Honor. Jablecki, okay. May it please the Court. Your Honor, as we begin, my name is Howard Jablecki. I represent the village of Schaumburg in the Consolidated Appeal. As counsel for TYCO, it indicated I'm going to be addressing the issues of state action immunity and the constitutional claims. Now, based on the applicable law and those arguments contained in our briefs and those addressed by counsel, it's clear that the district court, Judge Pallmeyer, made the correct decision, and that decision should be affirmed, both denying a preliminary injunction and dismissing all claims. Mr. Jablecki, in assessing the contract clause claim, did Judge Pallmeyer address the burden that was alleged by the plaintiffs in determining the amount of deference that should be given to the village? Because that's part of the initial factor. Correct. What she did address, Your Honor, was the rationale behind it, what the rationale behind. But before you get to the rationale or how much deference, you have to consider the burden. Did she do that in her analysis, either at the 12b-6 or the motion to reconsider? And if so, can you identify? I don't think she did it in great detail, Your Honor. I think she initially looked at the substantial impairment issues, moved past that, and went on to look at what was the legislative judgment. What impact should that have that she didn't seem to really address the burden in determining how much deference to give? I don't think she should have any, Your Honor, because the facts of the case, the pleadings, they all are incredibly clear as to the deference that should be given to the legislative action, the legislative judgment, in terms of the necessity and reasonableness of the particular measure they took. Judge Palmer specifically noted that a municipality may enact legislation that affects the right to contract where it's reasonably necessary to secure the public health and safety, general welfare of the community. And she specifically noted the Village of Hinsdale case that rejected a contract clause claim. But, you know, to what extent are you relying on a distinction between actually breaking an existing contract and non-renewal of a contract? And to what extent are you, if at all, relying on the fact that even after the hard stop, which is coming up pretty soon in 2019, there was a possibility of extension out some additional years? Well, that was definitely part of our argument as to whether there was an actual substantial impairment on the contract itself because the ordinance did not require an intermination. So, yes, we think that's an adequate basis for denying the contract clause claim. Judge Palmer didn't use that as her basis for rejecting the contract clause claim, but it does certainly come into play. But more importantly, I think you look at the legislative intent, the rationale behind the passage of the ordinance, and the law that supports it. The district court on the contract clause claim specifically held, you know, that it required commercial accounts eventually to switch to the direct connect, that the village did so after the Village of Hinsdale case had already been decided, saying, yes, it's okay. The Village of Hinsdale case isn't talking about breaking contracts. It's talking about it's okay to have direct connect and it's okay to, you know, take certain steps. Correct, which goes both on the contract clause issue and on the state action towards the foreseeability of the action itself. I guess I have a hard time seeing why there wasn't a contract clause claim stated. I understand the arguments you might have, you know, on the merits of it, but just looking at the four corners of the complaint, it's hard for me to see why a claim wasn't stated. Well, it's because, Your Honor, that they failed to overcome the presumption of validity of the legislative action. But in the law under the contracts clause is that you have to look at, you know, the severity of the impairment vis-à-vis, you know, the justification being put forward for it. So it's a bit of a tailoring analysis, you know, that needs to go on. And I don't know how you can do that within the four corners of the complaint. Well, and Justice Pallmeyer correctly held that the four corners of the complaint did not include the requisite allegations to meet that burden. And she indicated specifically that the ordinance contains those necessary justifications, the rationale for public safety, reliability, eliminating signal transmission delays, faster response times, that those. But did she hold that the allegations weren't there to meet the severity or that based on what was alleged there was a rational basis for what the village did? I'm not sure there's quite a distinction. I think what Judge Pallmeyer held was that the allegations in the complaint, the specific allegations in the complaint including, you know, the exhibits attached there too, the ordinance and the justifications, did not meet that pleading requirement. But doesn't the contracts clause require a bit of a different analysis? As Judge Scudder just pointed out, more of a tailoring based on what the substantial burden alleged is? Yes, Your Honors. But given the justifications, Judge Pallmeyer took that into consideration and she balanced it. She analyzed that those justifications and the presumption and their validity overcame that burden, that the pleadings failed to overcome that burden to establish a valid contracts clause claim. And, again, I want to point to that Hinsdale case. Your time is up, so if you want to just wrap up. Thank you, Your Honors. I appreciate it. All right. Thank you so much. Mr. Bersani. Good morning, Your Honors. My name is Mike Bersani. I represent DUCOM and Northwest Central Dispatch in these consolidated appeals. And as we stated in our briefing, to avoid duplication, I'm relying upon arguments made by other defense counsel here. So I just want to emphasize a few points, if I may. As for DUCOM, Judge Durkan correctly entered summary judgment, not only because there's no private cause of action under the District Act, but also DUCOM's role in receiving and processing and dispatching fire alarm signals is consistent with Illinois law, consistent with the District Act, consistent with this Court's decisions in the Lyle Woodridge litigation and the Hinsdale decision. DUCOM, the record is very clear, is not involved in the transmitting end of the network. They're only involved in the receiving end. DUCOM doesn't own radio transmitters located at premises. DUCOM does not contract with any end users or businesses that contract with their own fire alarm companies. DUCOM does not charge any fees to any end users at all. In the Bloomingdale Territory in particular, Bloomingdale passed an ordinance that, after the Lyle Woodridge litigation concluded, that allowed commercial premises to choose whatever private fire alarm vendor they wanted to choose and also allowed signals to be sent either by central stations or to remote supervising stations, but ultimately that the signal come back to DUCOM, which of course is consistent with Illinois law in this Court's decisions. In fact, Judge Durkin, I think, found in the first dismissal order that he entered correctly that communications dispatch centers can function, like DUCOM, and Northwest for that matter, can function as remote supervising stations, consistent with Illinois law. The fee charged, and the fee that's being challenged here, is a fee between DUCOM and TYCO. It's an administrative fee for the exclusive contract. It is not a fee imposed on end users. So it's charged for the use of the space in DUCOM? It's consideration for the entire agreement. So, yes, it's for the use of the space. It's for the services that DUCOM provides in processing the signals. So DUCOM is helping TYCO, in a sense, by processing the signals, by deciding what to do with any particular report, right? Right, exactly. But the important part, I think, is that in the Lyle Woodridge litigation, what was struck down was an ordinance by Lyle Woodridge that required end users to be responsible for any fees. That's not the case here. There is no such ordinance in this case whatsoever. This is a contractual arrangement that has a financial term like any other contractual arrangement. So they pay TYCO instead, right? I mean, it's not like they're getting this for free. They pay TYCO for the service. That's the end user? Yes, they do. That's right. That's right. As to Northwest Central Dispatch, Judge Pallmeyer correctly dismissed the complaint. I think that the allegations are on even thinner ice there because the contract between TYCO and Northwest is not even being challenged by the plaintiffs, nor is the authority for Northwest to enter into that contract. In fact, the plaintiffs have conceded that that contract between TYCO and Northwest is independently irrelevant to the proceedings. They keep talking about the implementation of the arrangement as opposed to, say, the ordinance or the contract or whatever. They're saying as operated, there's a problem. Right, but that's not Northwest's issue. Northwest receives the signals as the designated remote supervising station of the municipalities, and so they're just responding to what the municipal units would like to see legislatively. Northwest is not involved in the legislation itself, nor could it have any input on the actual legislative decision. So there's nothing alleged in this complaint by the plaintiffs in the Northwest case that allege anything illegal being done by Northwest at all in any way, shape, or form. And I think Judge Pallmeyer got that correctly. Okay. Thank you. Mr. Goldsmith, you have some time for rebuttal. I'd like to start with your first question of the morning and then move from there. You asked whether Article 11 gave the authority for this arrangement in both jurisdictions. The simple answer is that after Boulder, Phoebe Putney, and dental examiners, there's a requirement to look closely at whether there's a clearly articulated state policy which grants the monopoly. So this case is a little bit in between, isn't it? It's not like Boulder where they just said, we're a home rule city, ergo, we have immunity. It's not like Waste where there's a particular provision in the Illinois Code saying you can have a monopoly of waste calling. It's in between. It says, and we, the legislature of Illinois, want our municipalities to have as much antitrust immunity as possible when they're exercising authority under Chapter 11. Actually, it says with respect to government home rule units, with respect to government functions, and when they're acting within any number of these enumerated statutes. But Chapter 11 is one of them. I beg your pardon? Chapter 11 is a general police power section. But it does not designate any activity that's clearly articulated. I know that. It talks about safety, and under that authority municipalities, for example, have fire departments. But it deals with all kinds of activities. Right. So I'm saying this ordinance is in the middle. It's not just we're home rule, that's the end of it. It's not specific. It's in the middle. Well, I don't know how a state legislature can exempt a broad range of functions without any direct designation of the function. So that's an excellent question. People have debated the wisdom of Parker v. Brown since the minute it was decided. But the Supreme Court has stuck with it, and thus so will we. Well, I don't think so. I mean, I can't say you're wrong. But Boulder clearly says home rule power is not enough. All they did is basically – But there's more here. There's a statement from the Illinois legislature about state action immunity. There was not in Boulder. But Boulder dealt specifically with the – Dealt with cable TV. Yes, but in the context of exercising home rule power. But there was no statutory guidance from Colorado's legislature that's quite the same as what Illinois's legislature, General Assembly, has said here. But if the General Assembly could basically suspend the antitrust laws in the state of Illinois. When municipalities are acting. In any fashion. No, no, when municipalities are acting. That's what they're doing. No, because they're – Well, but the action is any activity that they may have authority under any statute. I mean, it is an incredibly broad range of authority. I agree that it's broad, yeah. And I think that this court needs to put some limits on that because monitoring isn't referred to anywhere in Article 11 or anywhere else in the municipal code. And it's not the municipality that's doing this, and that's where there's a big disconnect. Municipality just said send your signals to a remote supervising station wirelessly, and I don't want to beat that too hard, but it's very clear that that's the case. I want to go to some of the antitrust arguments. If we use rule of reason analysis, there was no competition or bidding for the contract in either community. And, in fact, there's no evidence of that. The witness for FICO was unable to define a geographic market for competing for exclusive contracts. And the testimony before Judge Durkin was not only was there no pro-competitive benefit, but it had a significant anti-competitive benefit because they're not paying $65.50. They're paying $89. $89 is a super competitive price, and they're getting no choice. Well, we don't know that really. I mean, I certainly understand you've alleged that. That was not the finding of the district court. We really don't know. We are told that this is apples and oranges, that they're a different type of service when you have an RSS. But there's no evidence to support that, that these are different. In fact, as you point out, it's the same product. I said they were closed substitutes. They're interchangeable from the standpoint of functionality. The municipalities don't think so. The municipalities pointed, for example, to a breakdown in the central station link that caused them to lose confidence in it. And the fire officials testified that there was a difference. In Orlin, the fire official who testified was talking about an experience in 2003 or earlier. There was no current experience with respect to that. And we put on numerous witnesses that showed that, in fact, in their own test, our central station operator beat their wireless system by a second. Judge Durkin rejected those arguments. No, he didn't reject the argument. He didn't make a point. Well, he did when he made the factual finding about what the village intended. Well. He couldn't have adopted your arguments and made that factual determination about the village's intent. How can you have a factual determination of the intent when, in fact, the statute, which the case law says should be interpreted by its plain meaning, the ordinance in this case, clearly says just send your signal to the designated remote supervising station. All of that testimony is irrelevant to the statutory interpretation or, in this case, the interpretation of the ordinance because it doesn't interpret an ambiguous ordinance. The ordinance is clear on its face. All right. You need to wrap up now. I'll let you leave us with one final thought. The decisions in Orlin with respect to summary judgment were contrary to what was established during that time. This court had already found I'll strike that. This court interpreted the District Act to apply in that circumstance relying on the same cases that we relied on in our brief, and the decision by the District Court in Orlin was incorrect because the court failed to interpret the ordinance correctly. Can I just say one for Schomburg? One thing. With respect to Schomburg, the District Court did not address correctly the contract clause or any of the other pleadings, found deficiencies that didn't exist because if we read it in a light, most favorable to the plaintiff, they wouldn't have been decided, and denied a preliminary injunction when we had established that there was no safety issue and we were entitled to be able to do the same kind of transmission that was required by the ordinance. Thank you for your time. All right. Thank you. Thank you to all counsel. We will take this case under advisement.